UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

C.A. NO. 04-CV-11073-MLW

|  |  |
|---|---|
| D.F. PRAY, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| TOWN OF SUNDERLAND, THE | ) |
| H.L. TURNER GROUP, INC., | ) |
| SARA COOPER and | ) |
| DANA KENNAN, | ) |
| | ) |
| Defendants. | ) |

## OPPOSITION OF PLAINTIFF TO
## MOTION FOR JUDGMENT ON THE PLEADINGS

### Introduction

This action arises out of an intentional, deliberate and illegal enterprise by

Defendants Kennan, Cooper and Turner, acting by and on behalf of the Town of

Sunderland (collectively referred to as "Sunderland"), which defrauded the

Plaintiff, D.F. Pray, Inc. (Pray) out of goods and services valued at

$1,488,996.47, by representing that it had the funds to pay for them, when, in

fact, it did not, in blatant violation of statutory law and fraudulently.

Sunderland has blithely tried to characterize this case as a simple

"straight-forward" construction dispute. It is not. The undisputed facts

demonstrate that Defendants, on three separate occasions, intentionally and

deliberately misrepresented to Pray, in writing, that it had funds to pay for the

cost of reconstruction of an elementary school in Sunderland, when, in fact, it did

not, and, Pray, in reliance thereon, continued to provide services and materials to Sunderland.

## **Statutory Framework**

The Town of Sunderland is a Massachusetts municipal corporation subject to M.G.L.c.44 §31, which limits the ability of a municipality to incur expenditures in excess of an existing appropriation. M.G.L.c.44 §31C applies to construction contracts and it gives contractors the right to receive written certification that funds exist to cover the cost of work, including change orders which it is going to do for a municipality. M.G.L.c.44 §31C states:

> § 31C. Construction contracts; certificate as to availability of funds; effect of certificate upon defense of insufficiency of appropriations.
>
> No contract for the construction reconstruction, alteration, remodeling, repair or demolition of any public building or public work by any city or town costing more than two thousand dollars shall be deemed to have been made until the auditor or accountant or other officer of the city or town having similar duties has certified thereon that an appropriation in the amount of such contract is available therefor and that an officer or agent of the city, town or awarding authority has been authorized to execute said contract and approve all requisitions and change orders. No order to the contractor for a change in or addition to the work to be performed under a contract subject to this section, whether in the form of a drawing, plan, detail or any other written instruction, unless it is an order which the contractor is willing to perform without an increase in the contract price, shall be deemed to have been given until the auditor or accountant, or other officer of the city or town having similar duties has certified thereon that an appropriation in the amount of such order available therefor but such certificate shall not be construed as an admission by the city or town of its liability to pay for such work. The certificate of the

> auditor or accountant or other officer of the city or
> town having similar duties that an appropriation In the
> amount of such contract or order is available shall bar
> any defense by the city or town on the grounds of
> insufficient appropriation; and any law barring
> payment in excess of appropriations shall not apply to
> amounts covered by any certificate under this section.

(emphasis supplied)

Chapter 44 §31C was enacted for the benefit and protection of

contractors. City of Lawrence v. Falzarano, 380 Mass. 18 (1980).  It creates a

"property interest" in certified funds.  In Falzarano, the Supreme Judicial Court

held:

> We believe, as did the Appeals Court, that c.44,
> §31C, entitled 'AN ACT PROVIDING THAT
> PAYMENT FOR CERTAIN PUBLIC
> CONSTRUCTION CONTRACTS SHALL NOT BE
> BARRED BY REASON OF BEING IN EXCESS OF
> APPROPRIATIONS,' discloses a very different
> legislative purpose from that of c.44, §31.  We concur
> in the Appeals Court's statement of this purpose, that
> being 'to provide contractors engaged in public
> construction work with a ready and reliable means of
> ascertaining that there is an appropriation sufficient to
> cover the proposed work and to protect them where
> the contract carries a certification that there exists a
> sufficient appropriation,' but no such appropriation
> exists.  (citations omitted) The statute was thus
> enacted for the benefit of one in Falzarano's position.
> Id. at 24-25.  See Broussard v. Melong, 322 Mass.
> 560, 562, 78 N.E. 623 (1948).

Here, Pray availed itself of the protections of G.L. c. 44 §31C by

requesting certification of funds from Sunderland.  Sunderland, in concert with its

Town Accountant, Cooper, Town Manager, Kennan, and Project Architect, the

H.L. Turner Group, Inc. (hereinafter "Turner") knowingly and intentionally

misrepresented, on three separate occasions, utilizing the mails of the United

States,  that it possessed appropriations for additional work, knowing Pray had to rely on these misrepresentations under c. 44 §31C, and do the work.

### Procedural History

This action was commenced on May 5, 2004, in the Bristol County Superior Court.   On May 24, 2004, Sunderland removed the suit to this Court pursuant to 28 U.S.C. §1446.  On June 1, 2004, Sunderland, Cooper and Kennan, filed its answer to the Complaint and asserted counterclaims against Pray.  Pray answered the counterclaims.  On June 21, 2004, Pray submitted its initial disclosures pursuant to Fed. R. Civ. P. 26(a)(1) and initiated document discovery.  On August 3, 2004, Pray submitted a Request for Production of Documents and a Request for Interrogatories to Sunderland and Turner. Sunderland and Turner have provided documentation.  Pray had noticed the depositions of Sunderland and Turner for the 6th and 14th of January 2005.  Now, after six months of active litigation, Sunderland filed this Motion for Judgment on the Pleadings.

For the following reasons, Pray submits that the Motion for Judgment on the Pleadings be denied.

### Standard of Review

The standard for evaluating a Rule 12(c) motion for judgment on the pleadings is "essentially the same standard for evaluating a Rule 12(b)(6) motion." Pasdon v. City of Peabody, 330 F.Supp.2d 22, 24 (D.Mass.2004) ((quoting Petricca v. City of Gardner, 194 F.Supp.2d 1, 4 (D.Mass. 2002) (quoting Furtick, et al. v. Medford Housing Authority, et al. 963 F.Supp. 64, 67

(D.Mass.1997)).  A trial court must accept all of the "nonmovant's well-pleaded factual averments as true, and draw all reasonable inferences in its favor."  Id. (quoting Rivera-Gomez v. de Castro, 843 F.2d 631, 635 (1st Cir. 1988 (citations omitted).  A Rule 12(c) motion should not be granted unless it is beyond doubt that plaintiff can prove no set of facts in support of its claim which would entitle it to relief.  Id.; See Massachusetts Candy & Tobacco Distrib. Inc. v. Golden Distrib. Ltd., 852 F.Supp. 63, 67 (D.Mass. 1994) (motion for judgment on the pleadings raising Rule 12(c) defense evaluated like Rule 12(b)(6) motion); Warren Lambert Co. v. Execquest Corp., 427 Mass. 46, 47 (1991) (on motion to dismiss, complaint is sufficient unless it appears "beyond doubt" that plaintiff can prove no set of facts that would entitle it to relief).

### Statement of Undisputed Facts

The undisputed facts clearly indicate an intentional and deliberate pattern of conduct whereby Sunderland represented to Pray, pursuant to M. G.L. c. 44 §31C, on three separate occasions, that appropriations existed to cover the cost of additional work which Sunderland specifically requested Pray to perform, when in fact, Sunderland never had such an appropriation and knowingly lied to Pray.

The specific allegations of the original Complaint read as follows[1]:

> Cooper, as the Town Accountant, on several
> occasions represented to Pray, through interstate
> commerce, including through the use of the U.S.
> mails, that sufficient funds existed to cover the cost of
> the work being performed by Pray, including
> additional work, over and above the original Contract."
> Complaint ¶18.

---

[1] Contemporaneously herewith, Pray has filed a Motion to Amend the Complaint, and an Amended Complaint which adds additional facts which were generated through document discovery.

Cooper provided said representations at the request of Pray pursuant to M.G.L. c. 44 § 31(c) to verify that funds were available to cover the cost of the work, including additional work over and above the original Contract, that Pray was providing to the Project. Complaint ¶20.

Kennan, as the Town Manager, on several occasions represented to Pray that sufficient funds existed to cover the cost of the work being performed by Pray, including additional work, over and above the original Contract. Complaint ¶30.

Kennan provided said representations at the request of Pray pursuant to M.G.L. c. 44 § 31(c) to verify that funds were available to cover the cost of the work, including, additional work over and above the original Contract, that Pray was providing to the Project. Complaint ¶31.

Turner, on several occasions represented to Pray, through interstate commerce, including through the use of the U.S. mails, that sufficient funds existed to cover the cost of the work being performed by Pray, including additional work, over and above the original Contract.  Complaint ¶41.

Turner provided said representations at the request of Pray pursuant to M.G.L. c. 44 § 31(c) to verify that funds were available to cover the cost of the work, including, additional work over and above the original Contract, that Pray was providing to the Project. Complaint ¶43.

Pray entered into a contract in the amount of $3,165,000.00 with

Sunderland for the construction of a project known as Sunderland Elementary

Emergency School Work.  Complaint at ¶ 6.  A true and accurate copy of the

Contract is attached as Exhibit A to the Amended Complaint.  On August 25,

2003, Sunderland certified to Pray, pursuant to M.G.L. c. 44 §31C that it had

available project funds in the amount of $4,100,000.00.  A true and accurate

copy of this certification is attached hereto as Exhibit B to the Amended Complaint.[2]  Complaint ¶¶ 20, 21.  However, of that $4,100,000.00 the amount for <u>actual</u> <u>construction</u> consisted only of $3,165,000.00, which was the value of the Contract.  The balance had been expended or encumbered for things such as architects fees, fire suppression and site work.[3]  At the time of the execution of the Contract, the Project had not been fully designed because of time constraints, and Sunderland was aware that the scope of the work and cost, would increase as the design was refined.

As the Project progressed, and the design was refined, the scope of the work and the cost increased.  Additionally, as the work progressed, Sunderland decided to expand the scope of the Project to include kindergarten renovations and a new roof.  On September 8, 2003, Pray, in writing, requested that Sunderland, through its Town Accountant, Cooper, certify the availability of funds for the additional work as required by M.G.L. c. 44 §31C.

On September 16, 2003, Turner, the Project Architect, sent Pray a letter acknowledging an increase in the scope and cost of Pray's construction work to $3,953,858.00 and indicated the existence of $4,308,143.00 in funds to pay Pray for the additional work.  Turner stated the following:

> Please find attached copies of the Architect's latest spreadsheets of accounting for the construction GMP and proposed changes.  The highest sum total, including all funds that DF Pray has asserted they are due, is $3,953,858.00.  This amount is well within the Owner's currently available project funds of

---

[2] This certification was attached to the original Complaint as Exhibit A.
[3] Said $4,100,000.00 was derived as follows: $3,165,000.00 for the General Contractor, $245,000.00 to Architect Fees and $690,000.00 defined as other for a total of $4,1000,000.00 less $450,000.00 for fire suppression and civil/site work

> $4,308,143.00... Please proceed with the remaining
> project work including additional work, and provide all
> required supporting documentation for our review as
> soon as possible.  Complaint ¶¶30-34, 41-46.[4]  A true
> and accurate copy of this letter is attached as Exhibit
> C to the Amended Complaint.

This letter was copied to Sunderland's Town Manager, Kennan.  In fact, the

representation of currently available project funds of $4,308,143.00 was an

intentional and deliberate lie.  Complaint ¶25.

Having not received a response from Cooper, the Town Accountant, who

is supposed to give the certification of funds under §31C, Pray again, on

September 18, 2004, wrote to Cooper, requesting certification of the funds:

> This follows our September 8, 2003 letter, to which
> we have not received a response from the Town, and
> our prior notices and requests to the Town for proper
> certification of funds for our contract as required by
> M.G.L. c. 44, Sec. 31C.  As we have repeatedly
> discussed, we are perplexed by the Town's delay in
> providing the required certification.  We have been
> informed by Town officials and the Architect that the
> Town has sufficient appropriated funds allocated to
> our contract to cover the currently assessed value of
> $3,953,858.00.  We again request that the Town
> Accountant provide a certification to that effect so we
> may be assured that the work can proceed without
> interruption.  A true and accurate copy of this letter is
> attached as Exhibit D to the Amended Complaint.

In response to Pray's request, on September 19, 2003, Sunderland, by

and through its Town Accountant, Cooper, certified that Sunderland had

"available project funds of $4,269,000.00".[5]   A true and accurate copy of this

---

[4] This letter was attached to the original Complaint as Exhibit C.

[5] Contemporaneously with this letter, on September 19, 2003, Turner, on behalf of Sunderland,
issued a Construction Change Directive ("CCD") no. 29 identifying "additional work not to exceed
$3,953,858.00".  A true and accurate copy of this memorandum is attached as Exhibit E to the
Amended Complaint.

letter is attached hereto as Exhibit F to the Amended Complaint.[6]  Cooper then requested Pray to "proceed with the remaining Project work, including additional work ..." See Exhibit F.  At the time Sunderland, Cooper and Turner represented the availability of funds to cover all additional work, and requested Pray to continue with the work, including additional work, the Defendants knew that that statement was false.  Complaint ¶¶ 19-23.  However, Pray, having received a written certification from Sunderland under M.G.L. c.44 §31C, and, in reliance thereon, proceeded to perform the additional work.  Pray substantially completed the Project in November of 2003 and Sunderland took beneficial use and occupancy of the schools.  Pray submitted a final requisition for payment, but Sunderland has not paid Pray.  Indeed, despite the fact that Turner acknowledged that the cost had risen to $3,953,858.00, Sunderland, in an attempt to cover up its lack of funds and buy time and leverage through the litigation process, is now trying to assert that Pray is entitled to less than what it is owed.

Discovery conducted to date has revealed that at no time did Sunderland ever have an appropriation for construction in excess of $3,165,000, the amount of the original contract.  Evidence of the lack of appropriations can be seen from Sunderland's own conduct in April 2004 after the Contract had been completed. On April 30, 2004, Sunderland voted at a Special Town Meeting to appropriate an additional $475,000.00 (less than the amount owed to Pray on the Project) "to rehabilitate, reconstruct, construct and otherwise repair" the Project. Sunderland has refused to even pay any of this appropriation to Pray.  A true

---

[6] This certification was attached to the original Complaint as Exhibit B.

and accurate copy of this Town Meeting Vote is attached hereto as Exhibit G to the Amended Complaint.

Sunderland's motive for lying to Pray about monies available for payment is simple. Sunderland wanted to get its school completed, including all of the bells and whistles, without having the money to do so. Pray had made it known to Sunderland that it would exercise its right, pursuant to M.G.L. c. 44 §31C, not to do any work in excess of $3,165,000.00 unless Sunderland certified the funds. Thus, Sunderland's solution was to certify available Project funds, in order to induce Pray to finish the Project at Pray's expense, and then, use the time and expense of the litigation process to try and work itself out of its loss. In essence, Sunderland knowingly misrepresented in its certification the amount approved to pay Pray, and used Pray as its bank, and the litigation process to buy time and leverage. Despite the fact that Sunderland's architect acknowledged that the cost of construction had risen to $3,953,858.00 (see Exhibit E and Exhibit F to the Amended Complaint) Sunderland is now forcing Pray to have to fight for its money by asserting frivolous backcharges. The type of conduct employed by Sunderland, Kennan, Cooper and Turner, quite frankly, is gross fraud, and, an abuse of the litigation process.

## Causes of Action

Pray has filed its original Complaint in the Massachusetts Superior Court for Bristol County alleging, claims for breach of contract, quantum meruit, misrepresentation, negligent misrepresentation, conspiracy, violation of M.G.L. c. 93A, R.I.C.O, violation of 42 U.S.C. 1983 (substantive due process), equal

protection, breach of the covenant of good faith and fair dealing, and a violation

of M.G.L. c. 12 §11(i).  Sunderland has moved this court for judgment on the

pleadings only on Count XI, R.I.C.O., Count XII, violation of 42 U.S.C. 1983

(substantive due process) and Count XIII, equal protection.

## ARGUMENT

**I.     COUNT XII OF THE COMPLAINT PROPERLY SETS
FORTH A CLAIM UNDER 42 U.S.C. §1983 FOR
SUBSTANTIVE DUE PROCESS VIOLATIONS BY THE
SUNDERLAND DEFENDANTS.**

Sunderland incorrectly asserts that Count XII is based on "procedural due

process" citing to Lujan v. G&G Fire Sprinklers, Inc., 532 U.S. 189 (2001).[7]  It is

not.  Count XII of Pray's complaint clearly states that it is based on the

"substantive right of due process."  Complaint ¶67.

"Due process claims may take either of two forms:  'procedural due

process' or 'substantive due process'."  Pittsley v. Warish, 927 F.2d 3, 6 (1st Cir.

1991) (quoting Hall v. Tawney, 621 F.2d 607, 610-613 (4th Cir. 1980)).

> Procedural due process requires that the procedures
> prescribed by the state in effecting the deprivation of
> liberty or property are adequate in light of the affected
> interest.  Whereas, substantive due process imposes

---

[7] In Lujan, the Court held the availability of a breach of contract action under state law provided
constitutional procedural due process to a party who was deprived of payment by the state under
a contract where the state maintained the party failed to comply with the contract terms and the
party claimed it had complied.  Id. at 196-97.  The court in Lujan stated:

> Where a state law ... is challenged on due process grounds, we inquire whether
> the State has deprived the claimant of a protected property interest, and whether
> the State's procedures comport with due process.
> Id. (emphasis added).

In Lujan, the analysis relied on whether a procedural deficiency existed depriving one of a
recognized property interest absent notice and hearing, a procedural argument that is
inapplicable to the case at bar.

limits on what a state may do regardless of what
procedural protection is required.  Id.

In Pittsley v. Warish, supra, the First Circuit Court of Appeals discussed

the elements of substantive due process as enunciated by the United States

Supreme Court.

> The Supreme Court has enunciated two alternative
> tests by which substantive due process is examined.
> Under the first theory, it is not required that the
> Plaintiffs prove a violation of a specific property or
> liberty interest; however, the state's conduct must be
> such that it shocks the conscience. 927 F.2d at 6.
> See Rochin v. California, 342 U.S. 165,172-173, 72
> S.Ct. 205, 209-10 (1952).To succeed under the
> second theory, a plaintiff must demonstrate a violation
> of an identified liberty or property interest protected by
> the due process clause. Id. See Meyer v. Nebraska,
> 262 U.S. 390, 399, 43 S.Ct. 625, 626, 67 L.Ed. 1042
> (1923).

In Rochin, the United States Supreme Court stated:

> Due process of law is a summarized constitutional
> guarantee of respect for those personal immunities
> which … are 'so rooted in the traditions and
> conscience of our people as to be ranked as
> fundamental', or are 'implicit in the concept of ordered
> liberty'. Rochin v. California, 342 at 169. (quoting
> Snyder v. Commonwealth of Massachusetts, 291 U.S.
> 97, 105, 54 S.Ct. 330, 332, 78 L.Ed. 674 (1934)), and
> (quoting Palko v. State of Connecticut, 302 U.S. 319,
> 325, 58 S.Ct. 149, 152, 82 L.Ed. 288 (1937)).

While the measure of what is "conscience shocking" is not thoroughly defined, it

does, as the Supreme Court noted "point the way".  County of Sacramento v.

Lewis, 523 U.S. 833, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998).  The Supreme

Court held:

> Behavior at the other end of the culpability spectrum
> that would most probably support a substantive due

12

> process claim; conduct intended to injure in some way
> unjustifiable by any government interest is the sort of
> official action most likely to rise to the conscience-
> shocking level. Id. at 849.  See Daniels v. Williams,
> 474 U.S. 327, 331, 106 S.Ct. 662, 665, 88 L.Ed 2d.
> 662 (1986) ("Historically, this guarantee of due
> process has been applied to deliberate decisions of
> government officials to deprive a person of life, liberty,
> or property") (emphasis in original).

While most substantive due process claims have been addressed in the

context of physical restraint or intrusion, substantive due process claims have

been recognized in commercial settings as it serves as the only check and

balance on a state actor.  For example, in Collier v. Town of Harvard, 1997 US

Dist Lexis 23582, 12 (D.Mass. 1997), the plaintiff's basis of its Section 1983

claim was that his requests for variances and special permits were repeatedly

denied by town functionaries who misused their municipal authority to hold

plaintiff's requests hostage in order to demand that he grant an easement for the

personal benefit of a member of the town planning board.  Id.  In identifying that

the plaintiff's claim was not about property rights but substantive due process,

that is, to be free from governmental coercion, the court held a plaintiff need

demonstrate that the "defendant's action was  in and of itself ... egregiously

unacceptable [or] outrageous."  Id. at 17 citing Licari v. Ferruzzi, 22 F.3d 344,

347 (1st Cir. 1994) (quoting Amsden v. Moran, 904 F.2d 748, 754 (1st Cir. 1990)

(citations omitted).  Judge Douglas P. Woodlock, in holding that the plaintiffs had

raised an issue of fact to survive summary judgment, stated unequivocally, that

the facts asserted,

> [I]f proven would be sufficient, if the jury were so
> inclined, to justify a finding of a substantive due

13

> process violation and that the plaintiffs have certainly
> pointed to 'at least some glowing embers' that
> indicate improper motivation on the part of the
> defendants. Id. at 26 (quoting Manego v. Cape Cod
> Five Cents Savings Bank, 692 F.2d 174, 177 (1st Cir.
> 1982)).

The United States District Court for the Southern District of New York has

applied substantive due process to contractual disputes holding that there are

"undoubtedly circumstances in which a breach of contract by a state actor would

raise substantive due process" implication. Irwin v. City of New York, 902

F.Supp. 442, 451 (S.D.N.Y. 1995). In Irwin,[8] the court acknowledged that a state

actor's conduct could elevate a contract dispute beyond a "run of the mill" breach

of contract, into a constitutional issue. The court held:

> Substantive due process protects those rights that are
> "so rooted in the traditions and conscience of our
> peoples as to be ranked as fundamental." Id. at 449
> quoting Local 342, Long Island Public Serv.
> Employees, UMD, ILA, AFL-CIO v. Town Bd. Of
> Huntington, 31 F.3d 1191, 1196 (2d Cir. 1994
> (citations omitted). Put another way, it "protects only
> those interests that are 'implicit in the concept of
> ordered liberty.' Id. Substantive due process extends
> also to "government action that is arbitrary,
> conscience-shocking, or oppressive in a constitutional
> sense ... Id. at 449-450 quoting Lowrance v. Acthyl,
> 20 F.3d 529, 537 (2d Cir. 1994)(citations omitted).

The citizenry of the United States must not fear that municipalities will

engage in fraudulent and deceptive acts depriving one of a fundamental right to

life, liberty, or property. Certainly, Pray has a vested interest in being paid for

labor, services, materials, and equipment, and, in maintaining its livelihood as a

---

[8] The Court gave considerable consideration to plaintiff's substantive due process argument,
where the owner of a houseboat sued the city alleging the municipality's refusal to offer a new
docking permit for their houseboat violated due process rights.

contractor.   It had a right to rely on the representations made by Sunderland, made pursuant to G.L. 44 §31C, before it undertook at great cost and expense to Pray, and to the benefit of Sunderland, to provide $1,488,996.47 of labor, services, materials and equipment to Sunderland.  Sunderland's deliberate and intentional misrepresentations, and, the resultant detrimental impact caused to Pray, especially in violation of a statutory mandate, should "shock the conscience" of the people of the United States.  As the courts have consistently held, the Fifth Amendment's Takings Clause prevents the Legislature (and other government actors) from depriving private persons of vested property rights except for a "public use" and upon payment of "just compensation"; one can not now argue the ability of a government actor to deprive a private individual of such a vested right would not rise to the level of "conscience shocking". [9]  It was fundamental enough for our forefathers to inscribe it within the Bill of Rights.[10]

By analogy, the Courts of this United States District, as well as the courts of the Commonwealth of Massachusetts, have had the opportunity to decide several cases founded in contract where conduct was so egregious that it was more than a mere run of the mill breach of contract,  but rather, a willful violation

---

[9] The United States Supreme Court held in PruneYard Shopping Center v. Robbins, 100 S.Ct. 2035, 2042 (1980):

> the term "property" as used in the Taking Clause includes the entire "group of rights inhering in the citizen's [ownership]." United States v. General Motors Corp., 323 U.S. 373, 65 S.Ct. 357, 89 L.Ed. 311 (1945). It is not used in the "vulgar and untechnical sense of the physical thing with respect to which the citizen exercises rights recognized by law. [Instead, it] denote[s] the group of rights inhering in the citizen's relation to the physical thing, as the right to possess, use and dispose of it. . . . The constitutional provision is addressed to every sort of interest the citizen may possess." Id., at 377-378, 65 S.Ct., at 359.

[10]  "[N]or shall private property be taken for public use, without just compensation." U.S. Const. Amm. V.

15

of Chapter 93A. A claim under M.G.L. c. 93A founded upon a contract requires

that the conduct elevate the dispute beyond a "mere breach of contract."

Whitinsville Plaza, Inc. v. Kotseas, 378 Mass. 85, 100-101 (1979). Indeed, the

type of conduct engaged in by Sunderland has been recognized in many cases

in this District Court to be more than a mere "run of the mill" breach of contract in

several c. 93A cases.

In Arthur D. Little International, Inc. v. Dooyang Corporation, 979 F.Supp.

919 (D.Mass. 1997), the court found a 93A violation where the defendant

continually ordered services without the intention of paying for them, made false

representations concerning its intent to pay in order to delay litigation and failed

to pay obligations to force reasonable price concessions. The court went on to

state, "this bad faith behavior when [plaintiff] attempted to enforce the contract ...

is a violation of Chapter 93A." Id. at 925. [11]

Additionally, courts have continued to impose sanctions on conduct of a

party which is an attempt to exert unfair leverage on another party by using forms

of pressure of the type alleged here. In Anthony's Pier Four, Inc. v. HBC

Associates, 411 Mass. 451 (1991), the Massachusetts Supreme Judicial Court,

extended the prohibitions of M.G.L. 93A "to include such conduct that is in

---

[11] See Nickerson v. Matco Tools Corporation, 813 F.2d 529, 531 (1987)(there is a close
relationship between a common law action for fraud and deceit and an action for unfair or
deceptive practices), See Bond Leather Co., Inc. v. Q.T. Shoe MFG. Co., Inc., 764 F.2d 928, 937
(1st Cir. 1985) (where plaintiff alleged defendant engaged in misrepresentation supported a
violation of 93A), See Purity Supreme, Inc. v. Attorney General, 380 Mass. 762, 777 (1980) ("[a]
practice may be deceptive if it could reasonably be found to have caused a person to act
differently from the way he otherwise would have acted")(citations omitted), McEvoy Travel
Bureau, Inc. v. Norton Company, 408 Mass. 704, 715 (1990)(common law fraud can be the basis
for a claim of unfair or deceptive practices under 93A), See Datacomm Interface, Inc. v.
Computerworld, Inc., 396 Mass. 760, 780 (1986) (actions involving fraudulent representations in
knowing disregard of the truth encompass culpable behavior under 93A).

disregard of known contractual arrangements and intended to secure benefits for

the breaching party." Id. at 474 citing Wang Laboratories, Inc. v. Business

Incentives, Inc., 398 Mass. 854, 857 (1986); See Hannon v. Original Gunite

Aquatech Pools, Inc., 385 Mass. 813, 825 (1982) (if proved, submission of low

bid followed by demand for more money after award of contract would constitute

violations of c. 93A). See also Pepsi-Cola Metropolitan Bottling Co. v. Checkers,

Inc., 754 F.2d 10, 17-19 (1st Cir.1985) (commercial extortion giving rise to c. 93A

liability, and treble damages, where defendant withheld payment due under

contract not because of dispute over liability or inability to pay but, rather, as

"wedge" against [plaintiff] "to enhance [defendant's] bargaining power for more

product"). Further, in Atkinson v. Rosenthal, 33 Mass. App. Ct. 219 (1992), in its

discussion of Anthony's Pier Four, Inc., supra, and Wang Laboratories, Inc.,

supra, the Appeals Court concluded:

> There is in those decisions a consistent pattern of the
> use of a breach of contract as a lever to obtain
> advantage for the party committing the breach in
> relation to the other party; i.e., the breach of contract
> has an extortionate quality and gives a rancid flavor of
> unfairness. Atkinson v. Rosenthal, 33 Mass. App. Ct.
> at 226.

A municipality building a school, of course, is not subject to c. 93A,

because it is not recognized as a business enterprise. That does not mean,

however, that a municipality has a free pass to engage in the type of conduct

which Sunderland has engaged in without any check and balance. In the case of

a municipality involved in a multi-million dollar commercial venture, the only

check and balance on fraudulent, bad faith, extortionate conduct, is the

17

Constitution of the United States. Substantive due process, plainly and succinctly should stand for the principle that a state actor cannot knowingly and intentionally defraud a citizen out of $1,488,996.47 in goods and services. If the Constitution does not stand for that then there is virtually no conduct that a state actor can engage in a commercial setting and be held accountable therefor.

Why would a municipality knowingly falsify certification of an appropriation on three separate occasions? Because Sunderland felt no fear and that it could act with impunity, but it cannot and this court must not condone its actions. Sunderland knew that if it told the truth, then Pray would not be obligated to continue with the work, and, in fact, would not continue with the work. Where is the check and balance? It lies in the very heart of the United States Constitution-substantive due process. A municipality may be beyond the reach of 93A in a public contract but it is not beyond the reach of the Constitution.

## II.    PRAY HAS STATED A VALID EQUAL PROTECTION CLAIM UNDER COUNT XIII.

In moving to dismiss Count XIII of the Complaint, Sunderland once again applies the incorrect standard. Its argument for dismissing Pray's equal protection claim turns completely on the assumption that this claim requires proof that Pray's conduct was based on an impermissible consideration such as race. While most equal protection cases rest on a claim of invidious discrimination based upon a suspect category such as race, color, national origin etc., a "gross abuse of power" also may directly implicate the equal protection clause as well as substantive due process. Collins v. Nuzzo, 244 F.3d 246, 251 (1st Cir. 2001), (quoting Creative Environments, Inc. v. Estabrook, 680 F.2d 822, 832 (1st Cir.

18

1982)) (equal protection claim may be founded on showing of "gross abuse of power, invidious discrimination, or fundamentally unfair procedures"). Violations of city or state law may become actionable under the equal protection clause where a plaintiff provides evidence of "vindictive action," "ill will," or "illegitimate animus." Village of Willowbrook v. Olech, 528 U.S. 562, 566 (2000) (Breyer, J. concurring); Esmail v. Macrane, 53 F.3d 176, 179-180 (7th Cir.1995) (finding viable equal protection claim based upon (i) mayor's "orchestrated campaign of official harassment directed against [plaintiff] out of sheer malice" and (ii) "spiteful effort to get [plaintiff] for reasons wholly unrelated to any legitimate state objective").

"[I]n the absence of invidious discrimination ... a party may establish an equal protection violation with evidence of bad faith or malicious intent to injure." Rubinovitz v. Rogato, 60 F.3d 906, 911 (1st Cir. 1995). In Rubinovitz v. Rogato, the United States District Court denied a motion for summary judgment on the equal protection claim noting that gross abuse of power may obtain where an official harbors personal hostility toward plaintiff, and undertakes a "malicious orchestrated campaign causing substantial harm". Id. The court went on to state:

> Under these circumstances, we think that although the case might be a difficult one for the plaintiffs, a reasonable jury might well be able to conclude that there was an orchestrated conspiracy involving a number of officials ... and substantial harm. ... [A]t the summary judgment stage, with the obligation to draw all reasonable inferences in favor of the party opposing summary judgment, we think this case should not be dismissed. Id. at 912.

19

As set forth above, Sunderland has grossly abused its power by engaging in this fraud intentionally and deliberately for the purpose of executing this scheme and artifice to defraud Pray of the amount due under the terms of the contract.  Chapter  44 §31C sets the standard of conduct by which municipalities must adhere to when interacting with contractors building their public buildings. In their conduct, Sunderland has treated Pray unlike any other contractor by blatantly dishonoring promises, commitments and terms of the contract. In light of such outrageous and bad faith conduct on the part of Sunderland, the Court should find that Pray has stated an equal protection claim under the "gross abuse of power" standard.

### III.    PLAINTIFF HAS STATED A VALID RICO CLAIM UNDER COUNT XI OF THE COMPLAINT

To survive a motion to dismiss the complaint need allege, "(1) conduct, (2) of an enterprise, (3) through a pattern (4) of racketeering activity." Doyle v. Hasbro, Inc., 103 F.3d 186, 189 (1st Cir.1996) (quoting Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 496 (1985).

Section 1962 (c) of the United States Code makes it unlawful

> "for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate of foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity ..." 18 U.S.C. §1962(c).

The phrase racketeering activity "means any act violating one of the many specified criminal statutes, including the federal mail fraud statute, 18 U.S.C. §1341." Systems Management, Inc. v. Loiselle, 303 F.3d 100, 103 (1st Cir.

2002); see 18 U.S.C. 1961(1). A "pattern of racketeering activity requires at least two acts of racketeering occurring within ten years of each other." Id.; 18 U.S.C. 1961(5). An enterprise "includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. 1961(4). In interpreting this requirement, there is "no restriction upon the associations embraced by the definition: an enterprise includes any union or group of individuals associated in fact." United States v. Turkette, 452 U.S. 576, 580 (1981). "Two or more legal entities can form or be part of association in fact RICO enterprise." In re Pharmaceutical Industry Average Wholesale Litigation, 263 F.Supp.2d 172, 182 (D.Mass. 2003) quoting United States v. London, 66 F.3d 1227, 1243 (1st Cir. 1995); see also River City Markets, Inc. v. Fleming Foods West, Inc., 960 F.2d 1458, 1462 (9th Cir. 1992) ("[v]irtually every business contract can be called an association in fact.")

The alleged racketeering activity here consists of acts indictable under the federal mail fraud statutes, 18 U.S.C. §1341, which constitute predicate acts of racketeering under 18 U.S.C. §1961(1). 18 U.S.C. §1341, states, as follows:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing

whatever to be sent or delivered by the Postal
Service, or deposits or causes to be deposited any
matter or thing whatever to be sent or delivered by
any private or commercial interstate carrier, or takes
or receives therefrom, any such matter or thing, or
knowingly causes to be delivered by mail or such
carrier according to the direction thereon, or at the
place at which it is directed to be delivered by the
person to whom it is addressed, any such matter or
thing, shall be fined under this title or imprisoned not
more than 20 years, or both. If the violation affects a
financial institution, such person shall be fined not
more than $1,000,000 or imprisoned not more than 30
years, or both.  18 U.S.C. §1341.

Sunderland's representation in its brief that Pray has made one

conclusory allegation misstates the facts as alleged.  In fact, the pattern alleged

reads as follows:

Cooper, as the Town Accountant, on several
occasions represented to Pray, through interstate
commerce, including through the use of the U.S.
mails, that sufficient funds existed to cover the cost of
the work being performed by Pray, including
additional work, over and above the original Contract.
Complaint ¶18.

Cooper provided said representations at the request
of Pray pursuant to M.G.L. c. 44 § 31(c) to verify that
funds were available to cover the cost of the work,
including additional work over and above the original
Contract, that Pray was providing to the Project.
Complaint ¶20.

Cooper knew that Pray would rely on said
representations before it would undertake and
continue performance of work on the Project.
Complaint ¶21.

At the time Cooper made said representations, she
knew that they were false, and, that the funds, in fact,
did not exist.  Complaint ¶22.

Cooper made said representations to induce Pray to continue to expend its own monies, to provide work on the Project. Complaint ¶23.

In reasonable reliance on said misrepresentations by Cooper, Pray expended $1,488,996.47 of its own monies to complete work on the Project. Complaint ¶24.[12]

Kennan, as the Town Manager, on several occasions represented to Pray that sufficient funds existed to cover the cost of the work being performed by Pray, including additional work, over and above the original Contract. Complaint ¶30.

Kennan provided said representations at the request of Pray pursuant to M.G.L. c. 44 § 31(c) to verify that funds were available to cover the cost of the work, including, additional work over and above the original Contract, that Pray was providing to the Project. Complaint ¶31.

Kennan knew that Pray would rely on said representations before it would undertake and continue performance of work on the Project. Complaint ¶32.

At the time Kennan made said representations, he knew that they were false and that the funds, in fact, did not exist. Complaint ¶33.

Kennan made said representations to induce Pray to continue to expend its own monies, to provide work on the Project. Complaint ¶34.

In reasonable reliance on said misrepresentations by Kennan, Pray expended $1,488,996.47 of its own monies to complete work on the Project. Complaint ¶35.[13]

Turner, on several occasions represented to Pray, through interstate commerce, including through the

---

[12] The referenced allegations, though under the heading of Count III were incorporated by reference in Count XI of the Complaint.

[13] The referenced allegations, though under the heading of Count V were incorporated by reference in Count XI of the Complaint

use of the U.S. mails, that sufficient funds existed to cover the cost of the work being performed by Pray, including additional work, over and above the original Contract. Complaint ¶41.

A copy of one such letter containing materially false representations is attached hereto and incorporated by reference herein as Exhibit C. Complaint ¶42.

Turner provided said representations at the request of Pray pursuant to M.G.L. c. 44 § 31(c) to verify that funds were available to cover the cost of the work, including, additional work over and above the original Contract, that Pray was providing to the Project. Complaint ¶43.

Turner knew that Pray would rely on said representations before it would undertake and continue performance of work on the Project. Complaint ¶44.

At the time Turner made said representations, it knew that they were false and that the funds, in fact, did not exist. Complaint ¶45.

Turner made said representations to induce Pray to continue to expend its own monies, to provide work on the Project. Complaint ¶46.

In reasonable reliance on said misrepresentations by Turner, Pray expended $1,488,996.47 of its own monies to complete work on the Project. Complaint ¶47.[14]

Sunderland, Cooper, Kennan and Turner conducted an ongoing enterprise to defraud Pray, including through interstate commerce and the use of the U.S. mails, and such acts constitute a pattern and practice of racketeering activity. Complaint ¶62.

As a result of said acts, Pray has been damaged in the amount of $1,488,996.47. Complaint ¶63.

---

[14] The referenced allegations, though under the heading of Count VII were incorporated by reference in Count XI of the Complaint

As provided above, Pray has set forth with careful attention and specificity the pattern of racketeering violating the RICO statute. First, that Sunderland, Kennan, Cooper and Turner combined to form an "association in fact" enterprise under RICO. *See* River City Markets, Inc. v. Fleming Foods West, Inc., 960 F.2d at 1460-61. Next, that the Defendants engaged in this fraud intentionally and deliberately for the purpose of executing this scheme and artifice to defraud Pray monies due under the terms of the contract; that this constituted a "scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promise ... sent or delivered by the Postal Service" and, as such, constituted "racketeering activity". *See* 18 U.S.C. §1341; Systems Management, Inc. v. Loiselle, 303 F.3d 100, 103 (1st Cir. 2002). Thus, the correspondence sent on September 16, 2003, September 19, 2003 and August 25, 2003 amounted to a "pattern of racketeering activity... occurring within ten years of each other." *See* 18 U.S.C. 1961(5).   As Pray has properly alleged a RICO cause of action, Sunderland's motion to dismiss Count XII must fail.

## IV.    PLAINTIFF'S STATE LAW CLAIMS SHOULD NOT BE DISMISSED

Notwithstanding the fact that Pray's complaint sets forth claims under Count XI, Count XII and Count XIII and the United States District should retain jurisdiction over all claims before it, the state law claims should not be dismissed. First, this is a Motion for Judgment on the Pleadings. Sunderland inappropriately argues dismissal of the state law claims under the auspices of the mediation

clause in the Contract between Sunderland and Pray. [15] Notwithstanding the fact that the mediation issue is not before the Court, the case should not be dismissed because it was Sunderland who refused to mediate. Specifically, Sunderland withdrew from mediation asserting that it was "in the untenable position of having to defend a lawsuit prior to the completion of meditation." Indeed, Sunderland voluntarily agreed to withdraw the mediation and proceed with this litigation. By doing so, it waived any right it had under the Contract to meditation. On July 12, 2004, the American Arbitration Association ("AAA") acknowledged receipt of "a letter dated July 8, 2004, from [counsel for Sunderland] ... [w]herein [Sunderland] agrees with [Pray] to withdraw" from mediation. [16] This letter is attached as Exhibit H to the Amended Complaint.

This position is inexplicable because the overwhelming majority of cases which go to mediation are in litigation. Indeed, this explanation is so spurious that there likely is another motivation for arguing the issue at this late date-to further delay the litigation.

By analogy, in cases involving a contractual agreement to arbitrate, courts have consistently held that a "party may implicitly waive its right to arbitrate by engaging in litigation." Goldsmith v. Pinez, 84 F. Supp. 2d 228, 232 (D. Mass. 2000). "If arbitration is invoked in response to a lawsuit, it must be done early on in the case so resources are not needlessly deployed." In re Citigroup, Inc., 376 F.3d 23, 26 (1st Cir. 2004) ((quoting Rankin v. Allstate

---

[15] In any event, the mediation provision in the Contract is only between Pray and Sunderland and not Cooper, Kennan and Turner.
[16] Of course, another motivation for Sunderland withdrawing from mediation is the fact that it had no funds to mediate with.

Insurance Co., 336 F.3d 8, 13 (1st Cir. 2003) (*citing* Menorah Ins. Co., Ltd. v. INX

Reinsurance Corp., 72 F.3d 218, 221 (1st Cir.1995)).

In the First Circuit, "no one factor dominates the framework for

determining whether a party has implicitly waived its right to arbitrate." In re

Citigroup, Inc., 376 F.3d at 26.

> In determining whether a party to an arbitration
> agreement, usually a defendant, has waived its
> arbitration right, federal courts typically have looked to
> [1] whether the party has actually participated in the
> lawsuit or has taken other action inconsistent with his
> right, ... [2] whether the litigation machinery has been
> substantially invoked and the parties were well into
> preparation of a lawsuit by the time an intention to
> arbitrate was communicated by the defendant to the
> plaintiff, ... [3] whether there has been a long delay in
> seeking the stay or whether enforcement of arbitration
> was brought up when trial was near at hand.... Other
> relevant factors are [4] whether the defendants have
> invoked the jurisdiction of the court by filing a
> counterclaim without asking for a stay of the
> proceedings, ... [5] whether important intervening
> steps (e.g. taking advantage of judicial discovery
> procedures not available in arbitration ...) had taken
> place, ... and [6] whether the other party was affected,
> misled, or prejudiced by the delay. Id. *quoting*
> Creative Solutions Group, Inc. v. Pentzer Corp., 252
> F.3d 28, 32-33 (1st Cir.2001)(*quoting* Jones Motor
> Co., Inc. v. Chauffers, Teamsters & Helpers Local
> Union No. 633, 671 F.2d 38, 44 (1st Cir.1982)).

Pray filed the Complaint on May 5, 2004, in the Massachusetts Superior

Court. If Sunderland wanted to attempt to enforce this mediation clause, it

should have moved to dismiss the action in State Court. Rather, it voluntarily

withdrew from mediation and proceeded to litigate for six months. On May 24,

2004, Sunderland filed a Written Notice of Removal to Federal Court pursuant to

28 U.S.C. §1446. At no time following the filing of the Complaint had Sunderland

moved to stay the cause of action pending mediation. In fact, quite the opposite has occurred here, Sunderland not only participated in the lawsuit, but they invoked the jurisdiction of the federal court. Additionally, Sunderland availed itself of this Court's jurisdiction by filing an answer and counterclaim against Pray. Further, Sunderland invoked the litigation machinery by filing its motion for judgment on the pleadings. Ritzel Communications, Inc. v. Mid-American Cellular Tel., Co., 989 F.2d 966, 969 (8th Cir.1993) (filing a dispositive motion invokes the litigation machinery).

As Sunderland has participated in the litigation, invoked the jurisdiction of this court, ignited the litigation machinery, and Pray has incurred great cost and expense in defense of this motion and in its commencement of discovery, Sunderland has waived its right to mediation under the Contract.

## V.     THE DISTRICT COURT SHOULD RETAIN JURISDICTION OVER THE STATE LAW CLAIMS

In the event this Court allows Sunderland's Motion for Judgment on the Pleadings with respect to Count XI, Count XII, and Count XIII, the United States District Court should retain jurisdiction over all state law claims before it.[17] This matter has been in active litigation in this Court for six months. Part of Sunderland's motivation is to utilize the litigation process to buy time and leverage over Pray, who is being seriously financially burdened by not having been paid $1,488,996.47 in monies owed Pray for its labor, services, materials and equipment. Cash flow is the lifeblood of construction companies. This suit

---

[17] It is important to note that in the event this Court grants Sunderland's motion, federal causes of action still remain with respect to Turner, as such, Sunderland's argument for dismissal and/or remand is premature and should not be considered. Notwithstanding this fact, Pray sets forth the following argument.

should not be further burdened by delay.   Case law in the First Circuit

establishes that:

> [i]n a federal question case, the termination of the
> foundational federal claim does not divest the district
> court of power to exercise supplemental jurisdiction,
> but, rather, sets the stage for an exercise of the
> court's informed discretion.  A. Pedraza v. Holiday
> Housewares, Inc., 203 F.R.D. 40, 44, citing Roche v.
> John Hancock Mutual Life Ins. Co., 81 F.3d 249, 256-
> 257 (1st Cir. 1996) (citing 28 U.S.C. §1367(c)(3))

The District Court "must take into account concerns of comity, judicial

economy, convenience, fairness and the like." Id. quoting Roche, 81 F.3d at 257.

In each specific case, the facts must be analyzed, and, in an appropriate

situation,  a federal court may retain jurisdiction over state-law claims

notwithstanding the early demise of all foundational federal claims.  Id. (citations

and quotation marks omitted).

In Roche, the First Circuit Court of Appeals affirmed the decision of the

district court to retain state law claims after the federal claims had been

dismissed. Roche 81 F.3d at 256-257.  The court emphasized the following:

> The litigation had matured well beyond its nascent
> stages, discovery had closed, the summary judgment
> record was complete, the federal and state claims
> were interconnected, and powerful interests in both
> judicial economy and fairness tugged in favor of
> retaining jurisdiction. Id. at 257.

Here, as in Roche and Pedraza, Pray has commenced with discovery

including document production and have noticed depositions.   A scheduling

conference originally scheduled for December 17, 2004, was cancelled in light of

Sunderland's pending motion.  Pray has incurred substantial time and expense in commencing discovery, and in its efforts to  respond to Sunderland's motion.

Additionally, as each day passes, Pray is further prejudiced.  Pray has incurred serious financial hardship as a result of the actions of Sunderland and Turner.  In fact, Pray is now being sued by subcontractors on the Project, specifically in Capital Carpet & Flooring Specialist, Inc. v. D.F. Pray Inc. et al.[18] and, Titan Roofing, inc. v. D.F. Pray et al.,[19] as a result of Pray being financially unable to remit payment in light of Sunderland's and Turner's actions.  Any further delay in this matter would plummet Pray deeper into an abyss of debt and litigation seriously jeopardizing its future existence.

Clearly,  comity, judicial economy, convenience, and fairness favor the District Court's retention of all state law claims before it.[20]

### PRAY HAS SUBMITTED A MOTION FOR LEAVE TO AMEND ITS COMPLAINT AND AMENDED COMPLAINT CONTEMPORANEOUSLY WITH THIS OPPOSITION

Notwithstanding the fact that Pray's well-pled allegations set forth valid causes action under Count XI, XII, and XIII, of the original complaint, and, as such, the court should deny Sunderland's motion, Pray has filed contemporaneously with its opposition a Motion for Leave to Amend the Complaint and Amended Complaint.  Pray seeks to assert additional factual allegations in support of all claims set forth in its original Complaint and which were developed from documents produced by Sunderland and Turner, in

---

[18] Middlesex Superior Court Civil Action Number 04-04466.
[19] Hampden Superior Court Civil Action Number 04-00887.
[20] In the event this Court decides not to retain jurisdiction over the state law claims, the causes of action, for the foregoing reasons, should be remanded back to Bristol County Superior Court.

response to Pray's requests for production, which corroborate the scheme and artifice to defraud Pray.[21]

## CONCLUSION

For the foregoing reasons, Pray requests that this Honorable Court DENY Sunderland's Motion for Judgment on the Pleadings.

Respectfully submitted,
D.F. PRAY, INC.
By its attorneys,

Edward F. Vena, BBO No. 508660
George Deptula, BBO No. 120820
Sabatino F. Leo, BBO No. 642302
VENA, RILEY, DEPTULA, LLP
250 Summer Street
Boston, MA  02210
(617) 951-2400

Date:  December 23, 2004

## CERTIFICATE OF SERVICE

I, Sabatino F. Leo, hereby certify that on this 23rd day of December 2004, I served a copy of the enclosed document via first class mail, postage prepaid to all counsel of record.

Sabatino F. Leo

---

[21] Pray sets forth these factors with specific detail in its Memorandum in Support of its Motion for Leave to Amend the Complaint filed herewith.