UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

C.A. NO. 04-CV-11073-MLW

| | |
|---|---|
| D.F. PRAY, INC., | ) |
| Plaintiff, | ) |
| v. | ) |
| TOWN OF SUNDERLAND, THE<br>H.L. TURNER GROUP, INC.,<br>SARA COOPER and<br>DANA KENNAN, | ) |
| Defendants. | ) |

**REPLY BRIEF IN RESPONSE TO THE OPPOSITION OF D.F. PRAY, INC. TO MOTION OF THE LAW FIRM OF VENA RILEY DEPTULA LLP TO <u>ENFORCE ATTORNEY'S LIEN</u>**

Now comes the law firm of Vena, Riley, Deptula LLP (hereinafter "VRD LLP") and hereby files a reply in response to the Opposition of D.F. Pray, Inc. (hereinafter "Pray") to the Motion of VRD LLP to Enforce Attorney's Lien. In its opposition Pray has blithely and cavalierly mischaracterized the facts and circumstances regarding the retention of VRD LLP by Mr. Scott Pray, President of Pray, in this matter and further has boldly asserted, disingenuously, and absent any evidence, that VRD LLP's representation had limited impact on the ultimate resolution of this cause of action. For the reasons set forth herein and in the Motion of VRD LLP to Enforce Attorneys Lien, VRD LLP respectfully requests this Honorable Court to enforce its attorney's lien and release payment of $18,283.93 plus interest to the law firm of Vena, Riley, Deptula LLP.

Moreover, because Pray's position lacks any basis in law or fact, VRD LLP respectfully requests that it be awarded its reasonable attorney's fees and costs in opposing this motion.

In light of these gross mischaracterizations, VRD LLP further submits the following:

**FACTS**

In March 2004 Scott Pray, President of Pray, approached Edward F. Vena, Esq., lead partner at the law firm of VRD LLP, with regard to legal representation in a complex construction dispute between Pray and the Town of Sunderland (hereinafter "Sunderland"). See Affidavit of Edward F. Vena, Esq., at ¶2. At this time, Pray had already sought the representation of the law firm of Holland & Knight LLP (hereinafter "Holland & Knight") in this matter and had retained Holland Knight as counsel. See Affidavit of Edward F. Vena, Esq., at ¶¶4,8. However, according to Mr. Pray, he had grown concerned with Holland & Knight's representation in this matter and felt that they had not acted aggressively enough in pursuing a cause of action against Sunderland; specifically, that Holland & Knight would not sue nor act upon what he thought were fruitful claims against Sunderland.[1] See Affidavit of Edward F. Vena, Esq., at ¶6. As such, Scott Pray informed Mr. Vena that he sought alternate representation in this matter. Mr. Pray indicated that he was concerned about attorney's fees, and discussed with Mr. Vena that there were a number of items that an associate could perform such as gather documents, draft pleadings, research, etc., which would result in lower fees. Mr. Pray

---

[1] As indicated in VRD LLP's Motion to Enforce Attorneys Lien, the dispute with Sunderland encompassed Sunderland's defrauding Pray out of goods and services valued at one million four hundred eighty eight thousand nine hundred ninety six dollars and forty seven cents ($1,488,996.47). Briefly stated, where a municipality contracts for a construction project, it is required to certify than an appropriation exists to cover the value of the work, including change orders. See Mass. Gen. Laws c. 44 §31C.

2

agreed to this arrangement. See Affidavit of Edward F. Vena, Esq., at ¶4. Thereafter, Scott Pray retained Mr. Vena.

Scott Pray and Mr. Vena sat down to discuss the facts regarding the current dispute with Sunderland. See Affidavit of Edward F. Vena, Esq., at ¶8. At the time Mr. Pray came to VRD LLP, his prior counsel Holland & Knight had already placed the claim in mediation, which is part of the contract, with Attorney Jack Spignesi. Id. Mr. Pray was informed that Mr. Vena could request a conference call with Mr. Spignesi, and counsel for Sunderland, Thomas McEnaney, to discuss going forward. Id. Mr. McEnaney confirmed that Sunderland did not have nor maintain the funds in which to commence with the mediation of this cause of action. Id. Once Mr. Vena communicated this fact to Scott Pray, Scott Pray became irate and felt that pressing forward with the mediation would be a complete waste of time as Sunderland did not have the funds in which to mediate with and pay a possible settlement. See Affidavit of Edward F. Vena, Esq., at ¶11. In fact, Scott Pray felt that pressing forward with the mediation would be a waste of time and money. Id. Most importantly, Scott Pray did not want to get sued in Western Massachusetts because of potential local bias and the cost of travel to Franklin County, Greenfield Superior Court. See Affidavit of Edward F. Vena, Esq., at ¶7. Mr. Pray was explicit in his instruction and felt as though Sunderland was acting cavalierly and using the cost and expense of litigation as leverage to buy Pray out of its valid claims. Additionally, Scott Pray had asserted that he desired that each member of Sunderland's Board of Selectman be sued individually and suggested that Mr. Vena

pursue potential criminal charges against the Board of Selectman.[2]  See Affidavit of Edward F. Vena, Esq., at ¶13.

Mr. Vena and Scott Pray discussed and explored the legal issues involving the case and discussed at length the filing of claims for state and civil rights violations.  See Affidavit of Edward F. Vena, Esq., at ¶12.  Though it was explained to Scott Pray that these types of claims were not commonly used in construction disputes, in light of the outrageous conduct perpetrated by Sunderland, there was sufficient evidence to assert the claims.  Id.  Scott Pray was advised of the difficulty of prosecuting these types of claims, however, he was excited and enthusiastic about the prospect of such a case; the aggressiveness that was lacking, according to Scott Pray, of his former counsel, Holland & Knight.  Scott Pray was informed that the filing of the lawsuit would forestall the mediation.  See Affidavit of Edward F. Vena, Esq., at ¶11.  Scott Pray replied that he had nothing to lose since going to mediation would not result in any immediate payment to Pray since Sunderland did not have the funds by which to pay any type of settlement.  Id.

At Pray's instruction, Mr. Vena filed the Complaint in the Massachusetts Superior Court for Bristol County[3] alleging, *inter alia,* claims for breach of contract, *quantum meruit*, misrepresentation, negligent misrepresentation, conspiracy, violation of M.G.L. c. 93A, R.I.C.O, violation of 42 U.S.C. 1983 (substantive due process), equal protection, breach of the covenant of good faith and fair dealing, and a violation of M.G.L. c. 12 §11(i).  See Affidavit of Edward F. Vena, Esq., at ¶14.

---

[2] Mr. Vena declined the pursuit of criminal charges against the members of the Board of Selectman, however, Mr. Pray sought local counsel to pursue this endeavor.
[3] Sunderland subsequently filed a Written Notice of Removal to the United States District Court pursuant to 28 U.S.C. §1446.

Subsequent to the filing of the complaint, VRD LLP engaged in substantial discovery both pursuant to the Massachusetts Rules of Civil Procedure and applicable Massachusetts statutes. See Affidavit of Edward F. Vena, Esq., at ¶16. Specifically, in light of the fact that, at that time, a scheduling order had not been set, VRD LLP submitted Freedom of Information Act Requests (FOIA)[4] to Sunderland, Regina Nash, Superintendent of Schools Frontier Regional & Union 38 School District, and the Commonwealth of Massachusetts Department of Revenue. Id. Through these efforts VRD LLP ascertained critical facts supporting the pending accusations, that is, that on three separate occasions, pursuant to Mass. Gen. Laws c. 44 §31C[5], Sunderland certified that sufficient appropriations existed in which to pay Pray for additional work provided on the Project.[6] It was by and through this discovery that Mr. Vena further solidified Pray's position that it had been misled and defrauded out of goods and services valued at one million four hundred eighty eight thousand dollars ($1,488,996.47).

Scott Pray was subsequently contacted by Mr. Vena and explained the contents of the various information obtained through its discovery efforts. See Affidavit of Edward F. Vena, Esq., at ¶18. Thereafter, Mr. Vena submitted to Scott Pray copies of correspondence derived from the above-discovery as well as a summary of his impression

---

[4] Additionally, Vena submitted Requests for Production of Documents and Propounded Interrogatories on the Defendants.

[5] M.G.L. c. 44 §31(c), provides, in relevant part,
> No contract for the construction, reconstruction, alteration, remodeling, repair or demolition of any public building or public work by any city or town . . . shall be deemed to have been made until the auditor or accountant . . . has certified thereon that appropriation in the amount of such contract is available therefor… No order to the contractor for a change in or addition to the work to be performed under a contract… shall be deemed to have been given until the auditor or accountant, … has certified thereon that an appropriation in the amount of such order is available therefore.

[6] Specifically, that on August 25, 2003, Sunderland, through its accountant, Defendant Sara Cooper (hereinafter "Cooper"), certified, it possessed $4,100,000.00 for payment on the Project and on September 16, 2003, Turner, on behalf of Sunderland, represented available project funds of $4,308,143.00 and again, on September 19, 2003, Sunderland, through its accountant, Cooper, certified it had currently available Project funds in the amount of $4,269,000.00.

of the strength of the pending cause of action and reference to specific exhibits. See Exhibit A.[7] Mr. Vena enclosed "two copies of [his] notes with accompanying exhibits" with regard to the pending cause of action. Id. Scott Pray never expressed anything but adulation for the work being performed by Mr. Vena. In fact, Mr. Ron Laprise, Vice-President of Pray, responded to Mr. Vena's notes, expressed gratitude and requested additional materials, specifically "smoking gun" letters that had been discussed between Scott Pray and Mr. Vena. See Exhibit B. Subsequently, Mr. Vena responded to Mr. Laprise's request and submitted the requested letters via facsimile. Mr. Vena stated the following:

> Ron, here is some additional correspondence. The so-called "smoking gun" letter – 3/6/04 – has a lot of collateral posturing about Pray overbilling.

See Exhibit C.

On November 22, 2004[8], Sunderland filed its Motion for Judgment on the Pleadings.[9] In response thereto VRD LLP set forth with specificity arguments in support of its position that the causes of action not be dismissed and that this Honorable Court retain jurisdiction over the pending cause of action. Contemporaneously thereto, VRD LLP submitted a Motion to Amend its Complaint accompanied by its Amended Complaint which set forth factually what had been uncovered throughout the course of discovery.[10] Almost immediately following submission of VRD LLP's pleadings, the

---

[7] All exhibits are true and accurate copies attached to the Affidavit of Sabatino F. Leo, Esq.
[8] Pray had noticed the depositions of Sunderland and Turner for the 6th and 14th of January 2005. Now, after six months of active litigation, Sunderland filed its Motion for Judgment on the Pleadings.
[9] Sunderland moved this court for judgment on the pleadings as to Count XI, R.I.C.O., Count XII, violation of 42 U.S.C. 1983 (substantive due process) and Count XIII, equal protection.
[10] It is important to note that Pray sought to amend after conducting its document discovery within the first six months of active litigation and absent a scheduling order issued by this Honorable Court and prior to any of the Defendants conducting same.

6

prospect of mediating this matter was again discussed.[11] Clearly, after reading the pleadings submitted by VRD LLP, Sunderland was concerned about the prospect of this cause of action going forward and being argued before a jury in the United States District Court. After being informed of Sunderland's change of heart, Mr. Vena contacted Scott Pray to inform him of such. See Affidavit of Edward F. Vena, Esq., at ¶24. Although Sunderland was still in the position of having to potentially borrow money to satisfy any settlement reached, Scott Pray was no longer concerned as Pray had been granted a contract in Connecticut worth over twenty-two million dollars ($22,000,000). See Affidavit of Edward F. Vena, Esq., at ¶24. As such, Pray was no longer concerned about company cash flow and agreed to proceed toward mediation. Id. Scott Pray however stressed the fact that he would agree only to Mr. John J. (Jack) Spignesi to serve as the mediator. Mr. Vena discussed the matter with Ron Laprise on January 20, 2005 who responded via email as follows:

> As a follow up to my phone conversation with Ed this morning, it is imperative that we have Jack Spignase[sic.] as our mediator, this can not slip through the cracks and Ed has assured me that this will happen. I am certain that Ed will inform you of this, but I want to ensure all are in tune with each other. Thanks.

See Exhibit D.

After consulting with counsel for Sunderland with regard to the mediation, it was agreed to that Mr. Spignesi would serve as the mediator. See Affidavit of Edward F. Vena, Esq., at ¶26. On February 2, 2005 a conference call was held with the mediator and counsel for Sunderland. See Affidavit of Edward F. Vena, Esq., at ¶27. During this conference it was agreed that the mediation would be held Wednesday April 27, 2005 and Thursday April 28, 2005. See Affidavit of Edward F. Vena, Esq., at ¶28. On

---

[11] No question as a result of the assertions set forth in VRD LLP's opposition.

7

February 8, 2005 Mr. Vena received written confirmation of the call as well as a copy of the Mediation Agreement. <u>Id</u>. On February 16, 2005, Scott Pray executed the Mediation Agreement and forwarded a check in the amount of $1,500 as a retainer fee for Mr. Spignesi. <u>See</u> Exhibit E. Mr. Vena began to prepare for mediation. Thereafter, on or about March 11, 2005, to the surprise of Mr. Vena, VRD LLP was notified that Scott Pray had retained Hinckley Allen Snyder LLP to serve as counsel for the mediation, despite VRD LLP having performed all the work leading up to the mediation. <u>See</u> Affidavit of Edward F. Vena, Esq., at ¶30. Thereafter the mediation commenced with Hinckley Allen Snyder LLP representing Pray.

On or about October 11, 2005, Sunderland and Pray entered into a Release and Settlement Agreement with regard t the Project,

> For and in consideration of a total payment of Nine Hundred Seventy-Five Thousand Dollars ($975,000) … Pray hereby forever releases and discharges the Town o Sunderland … from and all claims … arising out of, resulting from or relating to the litigation entitled <u>D.F. Pray, Inc. v. Town of Sunderland, et al.</u>, United States District Court for Massachusetts, C.A. No. 04-11073, <u>Capital Carpet & Flooring Specialists , Inc. v. D.F. Pray, et al.</u>, Middlesex Superior Court, C.A. 04-4466 and <u>Titan Roofing, Inc. v. D.F. Pray et al.</u>, Hampden Superior Court, C.A. No. 04-0887 and the construction project known as the Sunderland Elementary School Emergency Work Project for the Town of Sunderland, Massachusetts ("Project") and the contract therefore between the Town and Pray executed June 21, 2003 ("Contract").

<u>See</u> Exhibit F.

Further, both Sunderland and Pray agreed to incorporate the existing subcontractor state court actions of Capital Carpet & Flooring Specialists, Inc. and Titan Roofing, Inc. into the Release and Settlement Agreement.

> The parties agree to enter into stipulation of dismissal, dismissing with prejudice and without costs and with all parties waiving all rights of appeal, in <u>D.F. Pray, Inc.v. Town of Sunderland, et al</u>., United States

8

> District Court for Massachusetts, C.A. No. 04-11073MLW, and with respect to the third party claim and counterclaim in <u>Capital Carpet & Flooring Specialists, Inc. v. D.F. Pray, et al.</u>, Middlesex Superior Court, C.A. 04-4466 and <u>Titan Roofing, Inc. v. D.F. Pray, et al.</u>, Hampden Superior Court, C.A. No. 04-0887.

<u>Id</u>.

The $975,000 amount agreed to had to be borrowed since Sunderland did not have the money in which to pay Pray (which confirmed Mr. Vena's assessment from his inception of involvement in the case). <u>See</u> Affidavit of Edward F. Vena, Esq., at ¶ 31. In fact, on September 19, 2005, the Board of Selectman voted to enter into an Executive Session, with regard to a possible settlement with Pray, and the following transpired:

> Thomas McEnaney, Town Counsel was present to give a brief history relating to the D.F. Pray lawsuit. A tentative settlement has been reached with a final payment of $975,000. The town would need to produce an additional $268,000 in funds to meet the settlement. The case started with a request for payment of $1.7 million plus interest and attorney fees. Due to the higher costs associated with a trial and high risk for the town, total costs could be over $2.5 million. Town counsel recommended this as a good settlement to resolve this conflict. It was agreed to pay D.F. Pray $707,000 by the end of September and an additional $268,000 with 6-7 weeks, as we *would need a Special Town Meeting to appropriate these additional funds.* Mr. Fydenkevez reiterated that the Board was not displeased with the workmanship/quality provided by D.F. Pray just the value. Board voted to authorize town counsel to accept mediated settlement of $975,000. Motion Mr. Fydenkevez, 2nd Mr. Wissemann, 3-0 vote.

<u>See</u> Exhibit G.

A subsequent newspaper article which appeared in The Recorder on October 25, 2005 confirmed Sunderland's necessity to borrow the funds in order to satisfy the settlement agreement entered into with Pray. This article stated, in part, the following:

> Sunderland – The turnout was light for Monday's special town meeting but the vote was decisive: 47 residents unanimously agreed to borrow $300,000 for payment, settlement and final costs for repairs to the Sunderland Elementary School roof.

9

> About $268,000 of the $300,000 approved Monday night will go toward the final $975,000 payment to contractor D.F. Pray of Seekonk, a sum that was settled between the town and the contractor through mediation. The remaining $32,000 will be used for any final closing costs or unforeseen expenses.
>
> Most of the money for the settlement has already been approved by voters to be borrowed.

See Exhibit H.

## ARGUMENT

**A.  VRD LLP's Lien Encompasses the United States District Court, Middlesex County Superior Court and Hampden County Superior Court Actions**

Pray's opposition asserts, in error, that VRD LLP has no lien rights in the Capital Carpet & Flooring Specialists, Inc., and Titan Roofing, Inc. actions.  See Pray's Opposition Brief at 5.  In fact, it is clear, that the opposite is true.  In Northeastern Avionics, Inc. v. City of Westfield, 63 Mass. App. Ct. 509  (2005), the Appeals Court held that relief derived by a settlement in one action which had the effect of dismissing a second action amounted to "proceeds" as defined by the Attorney's Lien statue, Mass. Gen. Laws. Ch. 221, §. 50.  Id. at 514.  The Court went on to state,

> The settlement agreement conditioned the payment it contemplated on withdrawal of the appeal in the first action and voluntary dismissal of the second action. Both actions were essential ingredients of the overall settlement and, therefore, of the city's obligation to pay Northeastern.  It would be the "height of naivete" to conclude that a settlement agreement requiring the dismissal of an action by one party and the withdrawal of an appeal in a different action by the other party was "not a 'package settlement' of both cases."  And, if a stipulation of dismissal filed in return for payment of money yields "proceeds" to which a lien may attach, there is no reason why a notice of withdrawal of an appeal likewise filed, alone or as part of a package, in return for a payment of money does not also yield "proceeds" to which the statutory lien provisions also apply.

Id. quoting Kleager v. Schaneman, 212 Neb. 333, 341, 322 N.W. 2d 659 (1982).

10

The Release and Settlement Agreement executed by and between Pray and Sunderland specifically provided for the dismissal of the underlying subcontractor actions. That is, both the Capital Carpet & Flooring Specialists, Inc., and Titan Roofing, Inc. actions would be settled as result of the release and payment of the $975,000, and in fact, it was a condition of the settlement:

> The parties agree to enter into stipulation of dismissal, dismissing with prejudice and without costs and with all parties waiving all rights of appeal, in D.F. Pray, Inc.v. Town of Sunderland, et al., United States District Court for Massachusetts, C.A. No. 04-11073MLW, and with respect to the third party claim and counterclaim in Capital Carpet & Flooring Specialists, Inc. v. D.F. Pray, et al., Middlesex Superior Court, C.A. 04-4466 and Titan Roofing, Inc. v. D.F. Pray, et al., Hampden Superior Court, C.A. No. 04-0887.

Thus, dismissal of the state court actions were "essential ingredients" of the settlement. Id. The attorney's lien statute, G.L. c. 221, § 50, provides "attorneys [with] a statutory right to assert a charging lien securing compensation for their legal services." Boswell v. Zephyr Lines, Inc., 414 Mass. 241, 244, 606 N.E.2d 1336 (1993). As such, VRD LLP is entitled to payment of $18,283.93 for legal services rendered, which included services rendered on the underlying state subcontractor claims. It would be at the "height of naivete" for Pray to argue, or even think, otherwise. Northeastern Avionics, Inc. v. City of Westfield, 63 Mass. App. Ct. at 514.

**B.  Pray was Actively Involved and Informed Throughout the Litigation and the Work of VRD LLP was the Sole Factor in Sunderland's Decision to Agree to Mediation and to Settle the Dispute[12]**

---

[12] It is important to note that Pray asserts in its brief that Mr. Vena did not participate substantially in the cause of action, however, as stated in Mr. Vena's affidavit, Mr. Pray never objected to any of the bills submitted to Pray which detailed what work had been done and by whom. Additionally, Mr. Pray was fully informed that in order to keep legal costs down, associates would perform research, document review and file certain pleadings and he never objected to such.

11

Pray baldly asserts that VRD LLP provided little value or impact on the result achieved. See Pray's Opposition Brief at 6.  Yet Pray provides no evidence in any form as to what in fact could have impacted the mediation but for VRD LLP's work.  First, Sunderland confirmed the fact that it had no money in which to mediate the dispute at the inception of Mr. Vena's relationship with Scott Pray.  In fact, it was at the specific direction of Scott Pray that Mr. Vena forego any discussions regarding potential mediation that Sunderland would not leverage Pray into settlement.  Scott Pray desired to press ahead, even desiring to pursue criminal charges against the individual members of the Board of Selectman  Additionally, either Scott Pray or Ron Laprise were provided copies of all correspondence and pleadings filed on or behalf of Pray with regard to the pending litigation.  At no time did VRD LLP ever receive notice from either that the litigation should cease, that VRD LLP should not press ahead with discovery or that VRD LLP should proceed forward in an attempt to bring Sunderland back to the mediation table.  In fact, upon the filing of the cause of action, Sunderland in turn withdrew from mediation.

In October 2004, following the commencement of the pending cause of action and the embarking upon discovery, Scott Pray contacted Mr. Vena with regard to its status.  Thereafter, Mr. Vena submitted to Scott Pray a copy of correspondence derived from the discovery as well as a summary of his impression of the strength of the pending cause of action and reference to specific exhibits. See Exhibit A.  Mr. Vena enclosed "two copies of [his] notes with accompanying exhibits" with regard to the pending cause of action. Id.  Scott Pray never objected, nor did he direct Mr. Vena to cease and desist from this present course of action.  What Scott Pray did do, however, was request additional

material to review. That is, Mr. Ron Laprise, vice-president of Pray, responded to Mr. Vena's notes, requested additional materials, specifically "smoking gun" letters that had been discussed between Scott Pray and VRD LLP. See Exhibit B. Subsequently, Mr. Vena responded to Mr. Laprise's request and submitted the requested letters:

> Ron, here is some additional correspondence. The so-called "smoking gun" letter – 3/6/04 – has a lot of collateral posturing about Pray overbilling.

See Exhibit C.

Mr. Laprise was informed via email on January 17, 2005 that Sunderland agreed to mediation. Mr. Vena discussed the matter with Mr. Laprise on January 20, 2005. Mr. Laprise responded as follows:

> As a follow up to my phone conversation with Ed this morning, it is imperative that we have Jack Spignase[sic.] as our mediator, this can not slip through the cracks and Ed has assured me that this will happen. I am certain that Ed will inform you of this, but I want to ensure all are in tune with each other. Thanks.

See Exhibit D.

After consulting with counsel for Sunderland with regard to the mediation, it was agreed to that Mr. Spignesi would serve as the mediator. On February 16, 2005, Scott Pray executed the Mediation Agreement and forwarded a check in the amount of $1,500 as a retainer fee for Mr. Spignesi. Again, no objections from Scott Pray were ever received. In fact, not until March 2005, on the eve of mediation did Scott Pray inform Mr. Vena that he desired to terminate the attorney-client relationship. Only after

receiving benefits in excess of $18,000 Scott Pray now decided to retain substitute counsel for legal services.[13]

Notwithstanding Pray's bald accusations that the work of VRD LLP did not impact the mediation, counsel for Sunderland reasoned that without question it was a major reason for the settlement. In fact, Sunderland's counsel acknowledged the fact that its exposure to the current litigation was real and that settling this matter was in the best interest of Sunderland. This position was reaffirmed in counsel's advice to the Board of Selectmen.

> The case started with a request for payment of $1.7 million plus interest and attorney fees. Due to the higher costs associated with a trial and *high risk for the town*, total costs could be over $2.5 million.

See Exhibit G.

Thereafter, Sunderland agreed to settle the case for $975,000, only after Mr. McEnaney made it clear to the Board of Selectman that its risk, in light of the pending action, was much higher. Clearly, Mr. McEnaney would not have informed Sunderland to settle this matter with Pray had it had little risk of exposure on the underlying claims.

Without question there is clear evidence that had VRD LLP not pursued Pray's claims aggressively and zealously there was little chance the matter would have been mediated and even less of a chance that Sunderland would have settled in the amount of $975,000.

## C. Pray Has Provided No Evidence of the Reasonable Value of VRD LLP's Legal Services

---

[13] Scott Pray asserts that an additional $150,000 was spent for successor counsel to prepare for mediation. Again, he provides no evidence of such and he's refused to provide same. No doubt this amount was NOT expended.

Pray has provided no evidence with regard to the fair and reasonable value of the legal services provided by VRD LLP. In fact, rather than provide evidence Pray has made baseless assertions that VRD LLP's work did not impact or contribute to the mediation and that any value amounted to $6,000.[14] As stated above, this is groundless.

Moreover, though expert testimony concerning the fair and reasonable value of services rendered by an attorney is not required but "may be taken", Pray has provided no evidence at all. Neville v. Eufaula Bank & Trust Company, 639 F.2d 1197, 1202 (5th Cir. 1981)(appeal from bankruptcy proceeding).[15] Relying solely on the affidavit of Scott Pray, Pray rests on the fact that he may be asserting what is fair and reasonable, and that the Court will accept such a statement in blind faith. Additionally, Pray has failed to set forth any factors as to reasonable attorney's fees. See Cummings v. National Shawmut Bank, 284 Mass. 563. The Cummings court, *supra,* held in part the following:

> In determining what is a fair and reasonable charge to be made by an attorney for his services many considerations are pertinent, including the ability and reputation of the attorney, the demand for his services by others, the amount and importance of the matter involved, the time spent, the prices usually charged for similar services by other attorneys in the same neighborhood, the amount of money or the value of the property

---

[14] Moreover, it appears that Pray relies solely on the affidavit of Scott Pray with respect to the fair and reasonable value of legal services. This is misplaced. In fact, contemporaneously with this reply, VRD LLP has filed a Motion to Strike Certain Portions of the Affidavit of Scott Pray.

[15] In fact, numerous courts accept and consider the testimony of experts in determining a reasonable fee award. See, e.g. Mulhern v. Roach, 398 Mass. 18, 494 N.E.2d 1327, 1334 (1986)(action seeking award of reasonable attorney's fee wherein judge, as finder of fact, heard testimony of expert concerning usual fee charged in area for subject matter involved); Santry v. Richman, 6 Mass. App. Ct. 955, 383 N.E.2d 514, 515 (1978)(finding sufficient evidence due to expert's testimony to support jury's factual determination of $1,200 as reasonable attorney's fee); see also Collins v. Romer, 962, F.2d 1508, 1514-1515 (10th Cir. 1992)(evidentiary hearing in which court heard expert testimony concerning reasonableness of attorney's fees); Davis v. Locke, 936 F.2d 1208, 1215(11th Cir. 1991)(noting lower court's consideration of expert testimony and finding no error in calculation of hourly rate); Plyler v. Evatt, 902 F.2d 273, 278 (4th Cir. 1990)(finding no error in fee award wherein court considered expert testimony); Rode v. Dellarciprete, 892 F.2d 1177, 1185 (3rd Cir. 1990)(dicta noting in civil rights litigation that counsel should use expert testimony to establish necessity for contingency factor in attorney's fee determination); Hines v. J.A. LaPorte, Inc., 820 F.2d 1187, 1190 (11th Cir. 1987) (affirming attorney's fee award supported by evidence including expert testimony); Hefley v. Jones, 687 F.2d 1383, 1389 (10th Cir. 1982) (finding sufficient proof of value of attorney's services, noting hearing was held with expert witnesses and finding "no legal issue").

15

>affected by controversy, and the results secured. Neither the time spent nor any other single factor is necessarily decisive of what is to be considered as a fair and reasonable charge for such services.

Id. at 569.

Pray has offered nothing, but the hope that this Honorable Court will accept at face value what a contractor believes to be fair and reasonable. Mr. Vena has over 28 years experience in the field of construction law, is among the most sought after construction lawyers in the field and was retained in a matter worth in excess of $2,000,000. Clearly, these factors alone provide ample evidence that the fees charged Pray in this matter were in fact both fair and reasonable.

**D. Application for Attorney's Fees**

As amply demonstrated above, Pray's opposition and refusal to pay legal fees undisputedly due and owing VRD LLP is devoid of any legal merit, and totally lacking in factual or logical support. As such, it constitutes a frivolous attempt to avoid the inevitable results of its inexcusable and unjustifiable neglect, resulting in a waste of this Honorable Court's time and resources, and causing Defendant to incur unnecessary legal fees in defending its position. Accordingly, VRD LLP asks that this Honorable Court order Pray to reimburse VRD LLP for its fees associated with moving this Honorable Court to Enforce its Lien.

## CONCLUSION

WHEREFORE, VRD LLP respectfully requests that this Honorable Court enforce the attorney's lien and release payment of the $18,283.93 plus interest to the Law firm of Vena, Riley, Deptula, LLP and to award VRD LLP it reasonable attorney's fees associated with moving this Honorable Court to Enforce its Lien.

Respectfully submitted,

//s// Sabatino F. Leo
Edward F. Vena, BBO No. 508660
Sabatino F. Leo, BBO No. 642302
VENA, RILEY, DEPTULA, LLP
250 Summer Street
Boston, MA  02210
Dated:  February 7, 2006            (617) 951-2400

## CERTIFICATE OF SERVICE

I , Sabatino F. Leo, hereby certify that this document has been filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on this date.

Date: February 7, 2006            //s// Sabatino F. Leo
                                  Sabatino F. Leo