UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

C.A. NO. 04-CV-11073-MLW

| | |
|---|---|
| D.F. PRAY, INC., | )<br>)<br>) |
| Plaintiff, | )<br>) |
| v. | )<br>) |
| TOWN OF SUNDERLAND, THE<br>H.L. TURNER GROUP, INC.,<br>SARA COOPER and<br>DANA KENNAN, | )<br>)<br>)<br>)<br>) |
| Defendants. | )<br>) |

## AFFIDAVIT OF EDWARD F. VENA, ESQ.

I, Edward F. Vena, on oath depose and state the following:

1. I am a partner in the law firm of Vena, Riley, Deptula LLP (hereinafter VRD LLP"). I have spent 28 years in the area of construction law.

2. I was contacted in March 2004, by Scott Pray, President of D.F. Pray, Inc. (hereinafter "Pray") to secure legal counsel regarding an ongoing dispute with the Town of Sunderland (hereinafter "Sunderland"). Generally stated, Pray had performed a construction contract for the renovation of the Sunderland Elementary School which had been damaged in a snow storm. Pray contended that it was owed $1,488,996.47 for work, extra work and delays.

3. The unique thing about this claim is that Sunderland had ordered a significant amount of extra work, that, (as facts later proved) it did not have money to pay for. M.G.L. c. 44 §3(c) provides mechanism which a contractor can protect itself by requiring a

1

municipality to certify, in writing, that an appropriation existed to cover the cost of a change order. Despite the fact that Sunderland did not have an appropriation, it certified on three (3) separate occasions that it had $4,100,000, $4,269,000 and $4,308,143 in appropriations. It appeared that Sunderland, and, certain employees in essence, had procured over a million dollars in good in services through fraudulent means.

4. Mr. Pray also indicated that he was concerned about attorney's fees, and we discussed that there were a number of items that I could have an associate perform such as gather documents, draft pleadings, research, etc., which would result in lower fees. He thought it would be a good idea, and we followed that procedure. Scott Pray had informed me that he had previously retained the law firm of Holland & Knight LLP (hereinafter "Holland & Knight") regarding the dispute with Sunderland.

5. Mr. Pray was angry at the prospect of having to spend attorney's fees to go after Sunderland. He wanted to know if he could recover his attorney's fees under M.G.L. c.93A.

6. I advised him that c. 93A did not cover public school construction projects, but, due to the unique nature of this case, that there may be a constitutional violation or a possible RICO violation, through which Pray might have a vehicle to recover attorney's fees and costs. I did some research and determined that, in my opinion, there were viable constitutional and RICO claims that Pray could pursue. Mr. Pray was enthusiastic in pursuing these claims. According to Scott Pray, he felt that Holland & Knight had not acted aggressively enough in pursuing a cause of action against Sunderland. The case was in mediation at that time, but Scott Pray felt that the mediation was only a stalling factor.

7. I also advised Mr. Pray that if this case ended up in litigation in Franklin County, Greenfield Superior Court, where Sunderland was located, it could become expensive if I had to travel to appear for motions, scheduling conferences, and, trial. Mr. Pray was concerned about those costs, as well as the fact that a local jury might be biased in favor of Sunderland (considering the scope of the claim) and against a large construction company from southeastern Massachusetts. Mr. Pray wanted to secure jurisdiction in Bristol County, where he was located, and we decided to commence the suit in Taunton Superior Court.

8. At the time Mr. Pray came to me, his prior counsel Holland & Knight had already placed the claim in mediation, which is part of the contract, with Attorney Jack Spignesi. I told Mr. Pray that I could request a conference call with Mr. Spignesi, and counsel for Sunderland, Thomas McEnaney, to discuss going forward. My primary concern was whether Sunderland had the money to pay any settlement.

9. Prior to this conversation, I had checked the Town of Sunderland's website, and determined that it had borrowed $475,000 for payment of bills associated with the Project (most of it marked for vendors and consultants other than Pray). I was concerned that Sunderland had to vote to appropriate additional funds, and then borrow more funds, to pay the Pray debt. This also supported our case that Sunderland had lied about the existence of funds to pay Pray's change orders pursuant to c. 44 §3(c).

10. I spoke with Thomas McEneney, counsel for Sunderland, with regard to the potential mediation of the pending dispute. Mr. McEneney informed me that Sunderland did not have nor maintain the funds in which to satisfy a possible settlement at mediation

and, in all likelihood, if a settlement was reached Sunderland would have to borrow funds in which to pay Pray.

11. Following this conversation, I immediately contacted Scott Pray to inform him of the substance of my conversation with Thomas McEnaney. Once I communicated to Scott Pray that Sunderland did not have the funds to mediate with, he became irate and felt that pressing forward with the mediation would be a complete waste of time.

12. I discussed and explored the legal issues involving the case and discussed at length the filing of claims for state law violations as well as civil rights violations. I explained to Scott Pray that these types of actions were not commonly used in construction disputes but that in light of the outrageous conduct perpetrated by Sunderland and its architect, The H.L. Turner Group, Inc., that there was sufficient evidence to assert the claims.

13. I was also asked by Scott Pray if we could sue each member of Sunderland's Board of Selectman individually and pursue potential criminal charges against the Board of Selectman. I advised against suing the Board individually and declined any association with pursuing criminal charges against any member of the Board of Selectman for ethical reasons. Scott indicated that he would contact his personal counsel to pursue that endeavor.

14. At Pray's instruction, I filed the Complaint in the Massachusetts Superior Court for Bristol County alleging, *inter alia,* claims for breach of contract, *quantum meruit*, misrepresentation, negligent misrepresentation, conspiracy, violation of M.G.L. c. 93A, R.I.C.O, violation of 42 U.S.C. 1983 substantive due process, equal protection, breach of the covenant of good faith and fair dealing, and a violation of M.G.L. c. 12 §11(i). After service of the complaint on Sunderland, Attorney McEnaney informed me that

4

Sunderland could not mediate under the cloud of litigation and, therefore, withdrew from mediation.  In fact, this was just an excuse for avoiding mediation because of Sunderland's inability to pay a settlement anyway.  Indeed, most cases mediated have taken place after litigation is commenced.  Mr. Pray concurred, and since he felt that this mediation was only a stalling factor, was happy that the litigation had been commenced.

15.  Sunderland removed the case to the U.S. District Court on March 24, 2004.  In order to expedite this case, we initiated proper discovery and propounded interrogatories and served requests for production of documents.  Even though the Court had not held a scheduling conference, The H.L. Turner Group, Inc. produced its records.  However, Sunderland refused and we pursued documents through Freedom of Information Act (FOIA) requests.

16.  Though, Sunderland forestalled my discovery attempts, I submitted FOIA requests to Sunderland, Regina Nash, Superintendent of Schools Frontier Regional & Union 38 School District, and the Commonwealth of Massachusetts Department of Revenue.  It was through these efforts that I ascertained critical documentation supporting the pending accusations, that is, that on three separate occasions, pursuant to Mass. Gen. Laws c. 44 §31C, Sunderland certified that sufficient appropriations existed in which to pay Pray for additional work provided on the Project.

17.  Notably, throughout this process, both myself, and where appropriate associates, worked on the case as I had agreed with Mr. Pray.  VRD LLP bills submitted to Pray clearly indicated who had worked on this case.  Mr. Pray never questioned these bills or the people.

18. I contacted Scott Pray and explained what we had uncovered through all discovery efforts and explained to him that I felt as though we had a strong but difficult case. I followed up with Scott Pray, as a summation of our discussion, in October 2004. I prepared and submitted a packet of information that included letters received during discovery as well as some of my notes that reflected my impression of the pending lawsuit. See Exhibit A.[1]

19. After having received this packet Scott Pray contacted me to discuss the information further. Throughout this entire conversation Scott Pray never expressed anything but adulation for the work being performed. The conversation ended on a high note and Scott Pray seemed please with the work we had been doing and the prospect of seeing his company vindicated in court.

20. Thereafter, I received a call from Mr. Ron Laprise, Pray's Vice-President, requesting that I send over some additional letters that I had discussed with Scott Pray. I sent the additional information via facsimile and included the following note to Ron Laprise:

> Ron, here is some additional correspondence. The so-called "smoking gun" letter – 3/6/04 – has a lot of collateral posturing about Pray overbilling.

See Exhibit C.

21. On November 22, 2004, Sunderland filed its Motion for Judgment on the Pleadings. Once we received the Motion I contacted Scott Pray to let him know what had transpired and that we would be responding to the motion as well as amending the complaint to add facts revealed during discovery.

---

[1] All exhibits are true and accurate copies and attached to the Affidavit of Sabatino F. Leo, Esq.

6

22. Thereafter, we responded to Sunderland's motion. I set forth with specificity arguments in support of our position that the causes of action not be dismissed and that this Honorable Court retain jurisdiction over the pending cause of action. Contemporaneously thereto, we submitted a Motion to Amend the Complaint accompanied by an Amended Complaint which set forth factually what had been uncovered throughout the course of discovery.

23. Almost immediately following submission of the Opposition Brief and associated pleadings, Sunderland agreed to go back to mediation. Clearly, after reading the pleadings submitted on behalf of Pray, Sunderland was concerned about the prospect of this cause of action going forward and being argued before a jury in the United States District Court.

24. After being informed of Sunderland's change of heart, I contacted Scott Pray to inform him of such. Although Sunderland was still in the position of having to potentially borrow money to satisfy any settlement reached, Scott Pray indicated that he was willing to accept a payment plan, as his company had just received a contract in Connecticut worth approximately twenty-two million dollars ($22,000,000).

25. As such, Scott Pray was no longer concerned about company cash flow and agreed to proceed toward mediation. Scott Pray however, stressed the fact that he would agree only to Mr. John J. (Jack) Spignesi to serve as the mediator.

26. Mr. McEnaney and I agreed to continue the mediation with Mr. Spignesi as the mediator.

7

27. On January 20, 2005, I discussed the matter with Mr. Laprise, and informed him of such. Mr. Laprise thereafter responded with an email to my associate confirming our conversation of that day:

> As a follow up to my phone conversation with Ed this morning, it is imperative that we have Jack Spignesi [sic.] as our mediator, this can not slip through the cracks and Ed has assured me that this will happen. I am certain that Ed will inform you of this, but I want to ensure all are in tune with each other. Thanks.

See Exhibit D.

28. On February 2, 2005 a conference call was held with the mediator and counsel for Sunderland. During this conference call it was agreed that the mediation would be held Wednesday April 27, 2005 and Thursday April 28, 2005. On February 8, 2005, I received written confirmation of the call as well as a copy of the Mediation Agreement. I immediately forwarded this information to Scott Pray.

29. On February 16, 2005, Scott Pray executed the Mediation Agreement and forwarded a check in the amount of $1,500 as a retainer fee for Mr. Spignesi. For all intents and purposes as of February 16, 2005, Mr. Pray was onboard to proceeding towards mediation. See Exhibit E.

30. On or about March 11, 2005, to my surprise I was notified by Mr. Pray's secretary that Pray was terminating VRD LLP, and, I was directed to forward all files to Hinckley Allen Snyder LLP. I was stunned, and I also felt that it was an extraordinary waste of money to pay Hinckley Allen Snyder LLP to ramp up on this case, as I was very much aware of the facts and preparing to mediate the dispute.

31. I have learned that he case eventually settled with Sunderland paying Pray $975,000. See Exhibit F. I also understand that, as we had discussed, Sunderland had to make

multiple payments over time and I had to borrow funds to pay Pray. At the time, our firm had $18, 283.93 in outstanding fees due and owing, going back to April 2004. In all that time, we had never received any objection to the fees, or personnel or our work on the case from D.F. Pray.

32. Throughout the course of our engagement, Mr. Pray assigned us with three (3) additional lawsuits; <u>Capital Carpet & Flooring Specialists, Inc. v. D.F. Pray, et al</u>, Middlesex Superior Court, C.A. 04-4466 and <u>Titan Roofing, Inc. v. D.F. Pray, et al.</u>, Hampden Superior Court, C.A. No. 04-0887, and <u>Capital Carpet & Flooring Specialists, Inc., v. D.F. Pray, et al.</u>, Middlesex Superior Court, C.A. No. 04-4569. We followed the same billing arrangement with these cases. Again, associates were working on those cases with me, and, we billed accordingly without disruption from Mr. Pray.

33. From this case's inception up to termination, I have been actively involved in all aspects of the litigation. Whether it was discovery matters or responding to dispositive motions, I personally reviewed each and every pleading submitted on behalf of Pray. To suggest otherwise is simply not true.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY, this 7th day of February 2006.

                                                                                   //s// Edward F. Vena
                                                                                    Edward F. Vena